**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ASHLEY STEVENS and NICOLE BAER, | Case No. 22-CV-1096 |
| Plaintiffs, | |
| -against- | COMPLAINT |
| FRANK COLLECTIVE, INC., | JURY TRIAL DEMANDED |
| and JENNIFER IUEN, individually, | |
| Defendants. | |

Plaintiffs Ashley Stevens and Nicole Baer, by their attorneys, Crumiller P.C., as and for

their Complaint against Frank Collective, Inc. ("Frank Collective" or the "Company") and

Jennifer Iuen ("Iuen") (together "Defendants") allege as follows, upon information and belief:

**NATURE OF THE ACTION**

1.      Until they announced their pregnancies, Plaintiffs Stevens and Baer were excelling in

their careers at the successful advertising agency, Frank Collective. However, once they

disclosed their intentions to grow their families and take maternity leave, Frank Collective

discriminated against them, forcing their careers to a screeching halt. Despite their enormous

contributions to the company, Frank Collective terminated Plaintiffs under the guise of financial

cutbacks. Given Plaintiffs contributions to Frank Collective, compared to the contributions of

non-pregnant employees who were not selected for termination, the proffered excuse is illogical

and pretextual.

2.      As such, Plaintiffs bring forth this action to remedy claims of pregnancy discrimination

and retaliation, in violation of Title VII of the Civil Rights Act of 1964, including the Federal

Pregnancy Discrimination Act, 42 USC § 2000e[k]), 42 U.S.C. § 2000e *et seq.*; the New York

State Human Rights Law, N.Y. Exec. Law § 296(1); the New York City Human Rights Law,

N.Y.C. Admin. Code § 8-107(1)(a); and the California Fair Employment and Housing Act, Government Code, Title 2, Division 3, Part 2.8 §§12900 - 12996 (hereinafter Title VII, NYCHRL, NYSHRL, and CFEHA respectively).

## PARTIES

3.      Plaintiff Nicole Baer is an individual and former employee of Defendant Frank Collective at its Los Angeles office, where she did work for both Frank Collective's Los Angeles and Brooklyn offices. During the relevant time period, Baer resided in the state of California. Baer currently resides in Baltimore, Maryland.

4.      Plaintiff Ashley Stevens is an individual and former employee of Frank Collective at its New York office. Stevens currently resides in Brooklyn, New York.

5.      Defendant Frank Collective, Inc. is a domestic business corporation, incorporated in New York with offices located in Los Angeles and New York. The Company's principal place of business is in Los Angeles, California.

6.      Defendant Jennifer Iuen is Chief Executive Officer of Frank Collective who, upon information and belief, splits her residency between New York, New York and Los Angeles, California.

## JURISDICTION AND VENUE

7.      Federal question jurisdiction exists pursuant to 28 U.S.C. § 1331, as Plaintiffs have asserted claims that arise under federal laws of the United States. This Court has supplemental jurisdiction over Plaintiff's state and city law claims pursuant to 28 U.S.C. § 1367, as those claims are so related to federal claims in this action such that they form part of the same case or controversy.

8.      Venue is proper in the Eastern District of New York pursuant to 29 U.S.C. § 1391 because a substantial part of the events or omissions on which the claims asserted herein are based occurred in this District.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

9.      On April 12, 2021, Stevens filed a timely Charge of Discrimination ("Charge") with the U.S. Equal Employment Opportunity Commission ("EEOC").

10.     More than 180 days has elapsed since the EEOC assumed jurisdiction over the Charge. On December 2, 2022, the EEOC issued a Notice of Right to Sue to Stevens.

11.     On June 22, 2021, Baer filed a timely Charge with the California Department of Fair Employment and Housing ("DFEH").

12.     On August 1, 2021, DFEH issued a Notice of Right to Sue to Baer.

## FACTUAL ALLEGATIONS

### *General Background on the Company*

13.     In 2011, Jennifer Iuen and Mike Wasilewski founded Frank Collective, a branding and content agency. The Company offers brand strategy, art and creative direction, website design, animations, and advertising services.

14.     In 2017, Frank Collective expanded to approximately 15 employees between its Los Angeles and Brooklyn offices.

15.     As of January 1, 2021, Frank Collective employs approximately 40 individuals between its two offices. The Company has worked with various Fortune 500 companies such as American Express, Google, and Pfizer.

## ASHLEY STEVENS

***Stevens' History of Employment at Frank Collective***

16.     Stevens is a creative director and designer with extensive experience launching new brands and repositioning established companies through strategic insights and accessible design. Prior to joining Frank Collective, Stevens ran her own business providing art direction and graphic design to small start-ups and established creative teams with a focus on branding and visual communication, including, but not limited to, Collins, Google, Metropolis magazine, NBC, Open, Red Antler, Selman Design, SYPartners, and a variety of nonprofits. Stevens also served as an Adjunct Professor for Pratt University, teaching Portfolio and Business Development and Communication Design.

17.     On March 1, 2017, Frank Collective hired Stevens as an Associate Creative Director in its Brooklyn office. She reported to the two founders: Iuen, Chief Executive Officer, who worked out of the Los Angeles office, and Wasilewski, Chief Creative Officer, who worked out of the Brooklyn office.

18.     At the time, the founders were the only two individuals who held more senior roles to Stevens.

19.     Stevens excelled from the start and inspired new and creative thinking among the team, which in turn enhanced the team's designs, applied her innovative thought processes and direction to the team, created systems of accountability for designers when they did not meet their productivity deadlines. Stevens immediately received high praise and positive feedback from Iuen, Wasilewski, and from JJ Loonam, Managing Director, her peer who managed the Company's projects. In her first review, Iuen and Wasilewski stated, "We. Love. You" and stated in her second review, "You and JJ are the powerhouse team we are building off of here at Frank."

4

20.     In December 2017, after just 9 months at the company, Stevens was promoted to the role of Creative Director.

21.     Stevens' contributions during her first year at the Company were substantial. She did everything from performing the traditional responsibilities of a Creative Director to helping establish office culture and protocol for her team.

22.     Stevens was instrumental in the success and exponential growth of the Company; in a few short months, Stevens helped the Company grow from just fifteen to fifty employees across the two offices.

23.     In April 2018, due to the incredible growth of the team, the Company decided to relocate to a larger space in Industry City, New York.

24.     The Company expressed sincere gratitude for Stevens' contributions during this time. In her 2018 performance review, both founders praised Stevens, stating, "you continue to impress us and we value you so much as part of the Frank family… 2018 was a huge growth year for us as a company and we couldn't have done it without you."

25.     Stevens received a $5,000 bonus that year. The Company also provided merit raises to Stevens at least once each year.

26.     In the spring of 2018, Iuen had a mental breakdown and took paid leave.

27.     After her return, Iuen consistently projected a message to the Company that mental health was important and that the Company would be supportive of its employees' mental health efforts. In fact, in the August 2019 version of the Frank Collective Employee Manual, the Company went out of its way to provide assurances that it cared about "maintaining a healthy life-work balance (in that order)."

28.     On November 27, 2018, the Company announced its plans to implement a new family leave policy that would go into effect January 1, 2019. After receiving this news, Stevens requested clarification on the policy and was informed of the following available leaves:

- Up to six (6) weeks of fully paid Frank Family Leave; then

- Up to ten (10) weeks of partially paid NYS Paid Family Leave; and then

- Up to twelve (12) weeks of partially paid Short Term Disability Leave, for a total of twenty-sex (26) weeks of combined coverage.

29.     In April 2019, Wasilewski and his wife were approved for adoption and brought their baby home immediately. With little notice given to the team, Wasilewski took full advantage of parental leave for approximately 23 weeks from April until a week or so before Labor Day.

30.     Stevens took charge while Wasilewski was on paid parental leave. On July 17, 2019, Stevens received another glowing review where the Company thanked her for being "a huge help when Mike [Wasilewski] was out on Paternity Leave."

***Defendant Fails to Provide Stevens Her Entitled Maternity Leave or Accommodate Stevens' Pregnancy-related Medical Conditions***

31.     In the summer of 2019, Stevens learned she was pregnant. She informed both Wasilewski and Iuen in August and September respectively that her due date was in or around the second week of March 2020.

32.     Iuen initially congratulated Stevens on the phone, however, Iuen became cold in the months following. By way of example, Stevens noticed that Iuen avoided looking at her in meetings and avoided acknowledging or discussing Stevens' pregnancy in any regard in the first six months.

33.     In October of 2019, Stevens emailed the Company's operations managers, Julie Grant, to discuss maternity leave options.

34.     Stevens informed Grant that she was "thinking about what three to six month leave options would look like." Specifically, Stevens had clarifying questions relating to salary and benefit payouts, the leave approval process, and whether Frank would hold her job past the required 12 weeks.

35.     After receiving no response, Stevens followed up with Grant over Slack in order to initiate her accommodation request. Grant told Stevens that "Jiffy needs to make a decision."

36.     In response, Stevens complained that parental leave was company policy and yet she was made to feel as if she was "asking [for] permission."

37.     Following that Slack message with Grant, Stevens received inconsistent and disappointing information about the availability of leave, and it soon became clear that Defendants were not offering Stevens, a woman having a natural childbirth, with its stated parental leave.

38.     In November 2019, in contravention to company policy, Defendants informed Stevens that they wanted to make it "crystal clear" that her parental leave was restricted to 12 weeks, it was not fully paid, and it had to be taken within a predetermined and specific window. This was notably different than the treatment provided to Wasilewski, who had taken a four month leave without notice.

39.     In early 2020, the Company experienced financial hardships and did a round of layoffs.

40.     Upon information and belief, the Company did not have to pay rent when it first relocated to Industry City; however, once rent became due, the Company was forced to start the layoff process to make ends meet.

41.     Stevens panicked that she would be unlawfully targeted because she was pregnant, and that her pregnancy would be viewed as a cos" to the Company to cut.

7

42.     Around this time, Wasilewski announced that his wife was pregnant, and they were expecting another child. This prompted Stevens to have what she perceived to be a genuine heart-to-heart conversation with Wasilewski over the phone, in which she confessed her fear of termination, which was rooted in her concerns of pregnancy discrimination, and was reassured by Wasilewski that her position was secure.

43.     In a follow up email, Stevens confirmed with Wasilewski and Grant that her 12-week maternity leave would begin on March 9, 2020, noting, as Iuen advised, that her leave would start on that date whether or not the baby arrived that day.

44.     Wasilewski responded with seemingly support and excitement for Stevens' daughter's arrival, but responded with an ominous message, "regardless of everything happening here at work, she's the only thing that matters and super happy for you…," indicating that he believed Stevens' child was a priority over her work.

45.     Despite engaging in multiple conversations with her supervisors, Iuen and Wasilewski, and operations manager, Grant, where her maternity leave was verbally approved, it was not lost on Stevens that Iuen and Wasilewski had yet to approve of her upcoming maternity leave in writing.

46.     Due to the impending Covid-19 pandemic and the emotional distress she was experiencing fearing an unlawful termination on the basis of her pregnancy, Stevens' doctor advised her not to go into work.

47.     Thus, Stevens used 5 days of accrued vacation time to begin her leave on March 2, 2020, approximately a week before her due date.

48.    On March 21, 2020, the same day that Governor Cuomo signed the "New York State on PAUSE" executive order, Stevens gave birth to her daughter two weeks past her due date via an unplanned caesarean section.

49.    Stevens' approved maternity leave plan was now in jeopardy due to the late and unplanned birth of her daughter. The 100% Company paid leave she was expecting was now pushed outside of the arbitrary twelve-week window set by Iuen.

50.    Concerned about her leave agreement, Stevens emailed Grant on March 27, 2020 to clarify the breakdown of her leave once more. Grant informed Stevens of the following leave plan:

- March 2 - 6: Five-days PTO (normal salary);
- March 9 –13: Five-days sick time (normal salary);
- March 15 – 20: One-week of Frank Paid Family Leave (normal salary);
- March 23 – 27: No pay (waiting period for short-term disability); Stevens had to be out of work for at least one week before benefits could start. Pending the date of approval of her claim, the Company would go back and fill in time with Company paid leave if necessary;
- 7-weeks of paid short-term disability (60% of salary) after the one week waiting period; and
- 5-weeks of Frank paid leave remaining.

51.    Consequentially, Stevens was left with ten (10) weeks of maternity leave by using a combination of vacation days, sick time, unpaid leave, three weeks of Company paid leave and Short-Term Disability Insurance.[1]

52.    Due to her c-section recovery in the midst of a pandemic, Stevens experienced emotional and physical challenges; thus, she was unable to come back from leave on her planned June 1, 2020, return date.

---

[1] Stevens ended up returning three weeks of Short-Term Disability (approximately $3,000) in order to receive three weeks of salary for the full six weeks of Company paid leave.

53.     Stevens proposed to Grant that she return to work on June 18, 2020 and work three-days the following week to ease into the balance of full-time work and caring for a newborn. Grant forwarded Stevens' requests to Iuen and Wasilewski.

54.     Wasilewski was scheduled to begin his leave on June 15, 2020.

55.     During this time, the Company continued to inform its employees that it was suffering financially.

56.     Grant relayed in an email on May 7, 2020 that Stevens could not use her remaining three unused weeks of Company paid leave due to the fact that it fell outside of the arbitrary twelve-week window established by Iuen. Further, Grant stated due to the company's financial position and Wasilewski's leave, Stevens would not have the option to work part-time.

57.     Instead, Iuen suggested that Stevens could take one unpaid week, making her new anticipated return date June 9, 2020.

58.     In acknowledgement of Stevens' pain and frustration, Grant suggested a Zoom call with Stevens, Iuen, and Wasilewski around the second week of May.

59.     On the call, Stevens, who had essentially helped build Frank Collective and had been a team player and a strong performer since day one, implored Iuen and Wasilewski to give her a few more weeks to recover from the trauma of her pandemic c-section childbirth.

60.     In doing so, Stevens revealed that she was experiencing emotional distress and requested a reasonable accommodation take her additional parental paid time off.

61.     Frank Collective rejected Stevens' request out of hand.

62.     Stevens then requested to work part-time or to work flexible hours.

63.     Despite presenting well-thought-out options, Stevens' pleas were met with "No."

64.     Stevens was dismayed by her inability to engage in an interactive dialogue with Ieun about her request.

65.     Stevens felt that she was being penalized for having a c-section, which led her to reach out to the organization, A Better Balance, who informed her that she was entitled to New York Paid Family Leave ("NYPFL").

66.     Thus, she followed up the disappointing call with Grant, Iuen, and Wasilewski with an email stating that she would use the rest of her NYPFL and her four accrued vacation days and be back in the office on August 10.

67.     Stevens was eventually informed that Iuen had approved this proposal.

***Respondent Unlawfully Terminates Stevens Under False Pretext that Company is Closing***

68.     Alongside negotiating a new leave plan, Stevens dealt with various trauma-inducing situations stemming from Frank Collective's refusal to engage in an interactive dialogue concerning her requests for reasonable accommodations. Stevens' doctor diagnosed her with post-partum depression and Covid-19 rates were still rising at an alarming rate. Stevens lived in fear each day that her family, including her newborn, would be exposed to the virus.

69.     In or around July 2020, Stevens began seeing a therapist for the first time.

70.     On or around August 10, Stevens returned to work.

71.     By that time, Frank Collective had moved out of its physical office in Industry City, and announced on August 12, 2020, in individual meetings with each employee that the Company was supposedly closing.

72.     On August 17, 2020, Iuen notified all employees in a Company-wide email that everyone's last day would be October 15, 2020, but that the Company, curiously, might be signing on one more project to complete before shutting down.

73.     Stevens was assured that the client, Kasa, was aware that the Company was closing and was interested in retaining the Company for this last project before the official closure.

74.     Stevens was assigned to the lead strategy role for the project, and in that capacity worked with Loonam, Creative Director Andrew Almeter, and Associate Creative Director Rocky Santaferraro.

75.     As they worked on the project together, Stevens learned that the termination dates of Loonam, Almeter and Santaferraro had been extended to October 31, 2020 in order to allow for time to complete the Kasa project.

76.     Stevens also noticed that there were new pitches on her colleague's calendars in the months of September and October.

77.     These apparent efforts to keep Frank Collective afloat were in direct contradiction to the messaging she had been receiving about its certain closure.

78.     Furthermore, Almeter told Stevens that the Company was not closing, but was in fact being acquired and that others had been told that their positions were safe.

79.     Having received no such information or assurance personally, despite having been an integral member of the Company's original team, Stevens requested a meeting with Wasilewski to understand exactly what was happening.

80.     The meeting with Wasilewski was bizarre, at best. Wasilewski confirmed that the Company was likely to be acquired and explained at length how favorable the deal would be for him and Iuen in that they would be absolved of their personal debt and could just do the work they always wanted to do without the responsibility of running a business.

81.     Iuen told Stevens that she was the only person who had not received a 20% pay cut –
even though this was not true, and Stevens knew that Loonam and Almeter had not received
pay cuts either.

82.     Furthermore, Wasilewski confirmed that most of the Company's employees would
remain employed, but that Stevens would not.

83.     Wasilewski reiterated the plan to terminate all employees in a one-line email to Stevens,
stating that all Frank Collective employees would be terminated on either October 15 or
October 31, 2020. As discussed below, Stevens quickly learned that Wasilewski was lying,
likely to conceal the unlawful and discriminatory motive for terminating Stevens.

84.     Shortly thereafter, Eric Brown, Executive Producer, tendered his resignation in
September of 2020, but told Stevens that Iuen and Wasilewski had asked him to remain at the
Company to work on more upcoming projects.

85.     The week before Stevens' last day, Iuen requested to sit down with Stevens and
Wasilewski. Obviously concerned about the proximity to her maternity leave and departure
from the Company, Iuen attempted to convince Stevens that she was not the only employee
who was not offered a position with the new company. However, Stevens had spoken to the
remaining Frank Collective employees in the Brooklyn office and knew that what Iuen was
saying was untrue.

86.     Iuen's clearly pretextual reasoning for her termination did nothing to alleviate the
immense devastation Stevens felt at being terminated from a company she had worked so hard
to help build.

87.     Stevens' last day was October 15, 2020. While her health insurance was extended through October 31, 2020, she received no severance and no company contribution to the prohibitively expensive COBRA coverage she was offered.

88.     Stevens' termination letter assured her that her termination was unrelated to her performance, and that she should feel free to use any senior leadership member as a reference in her future endeavors.

89.     Upon information and belief, Loonam remains employed by the Company as a contract attorney.

90.     Adomas Bruzga, an employee who relocated to Lithuania after having been laid off in January 2020, was brought back to work remotely as a contract employee for the Company.

## NICOLE BAER

### Baer's History of Employment at Frank Collective

91.     In 2014 and 2015, Baer initially worked for Frank Collective as a freelance producer, where she established good relationships and received extremely positive feedback on her work,

92.     In 2015, Baer ended her employment with Frank Collective on good terms when she was offered a full-time position at another company. Over the years following, Baer stayed in touch with Frank Collective's Chief Executive Officer, Iuen.

93.     In 2019, Baer was working full-time at AT&T when she was offered a full-time role at Frank. Although Frank offered her a lower salary than what she was making at AT&T, Baer accepted the offer to work at the Company because of the prospective culture of work-life balance at Frank Collective and saw the job as a professional opportunity to build her own creative team.

94.     During Baer's onboarding process in 2019, Iuen specifically made a point to inform Baer about Frank Collective's family leave policy and told Baer that employees were entitled to 12 weeks of family leave, regardless of how long they have worked at the Company.

***Baer Announces Her Pregnancy and Immediately Experiences Negative Treatment***

95.     In July 2019, Baer found out that she was pregnant. However, she chose not to immediately disclose her pregnancy to Iuen due to her impression, informed by years of working with both Iuen and her husband, that Iuen did not have a positive view of her employees' pregnancies.

96.     In August 2019, Baer informed Iuen that she was pregnant.

97.     As Baer had anticipated, Iuen did not react to her news positively and their relationship suffered.

98.     Following her disclosure, Iuen made a point to cancel their weekly one-on-one meetings that had been scheduled on the calendar routinely since Baer had been hired. Offered no reason for the cancellations, and if a reason was offered for the cancellation, it appeared fabricated at best.

99.     Despite Iuen's negative treatment of Baer, Baer persisted to engage with HR regarding her upcoming paternal leave. Baer was confident that her history of success at the Company would ensure that she was treated appropriately and safeguard her role upon her return from maternity leave.

100.     During this time, Baer continued to ensure that her department was operating smoothly in her absence and was appropriately staffed.

15

101.    On September 19, 2020, Baer met with the Company's operations manager, Grant,

regarding the paid leave policy at Frank Collective. Baer was informed that she would be entitled

to the leaves, upon approval from Iuen, as follows:

- Four (4) weeks of Frank Paid Leave;

- Six (6) weeks of California Paid Family Leave; and

- Four (4) to Eight (8) weeks of Short-Term-Disability Leave.

102.    During the conversation with Grant, Grant informed Baer that Iuen was not happy about

Baer taking the full fourteen weeks of leave.

***Defendants Discriminatorily Terminate Baer's Employment***

103.    On September 23, 2019, only two business days after Baer had finalized her impending

leave, she was terminated in a meeting with Grant and Iuen.

104.    Baer was extremely pregnant, and was forced to humiliatingly wait over forty-five

painstaking minutes for assistance with removing her belongings from Frank Collective's office.

105.    The Company framed Baer's termination as a "layoff" due to the alleged financial

situation of the Company and told Baer the termination was unrelated to her work performance.

106.    Baer found the Company's proffered reason to be strange, given that the Company had a

practice of substantial, regular turnover, and constantly hired new employees.

107.    Moreover, her termination was the first time she was ever informed that the Company

was experiencing dire financial problems or that layoffs were even being considered.

108.    Notably, Baer was the executive producer across all of Frank Collective's LA accounts

and was the main point person for the biggest account in the Company. Given Baer's senior role

at the Company, she would have been made privy to information relating to the Company's

financial circumstance.

109.    Within approximately 4-6 weeks of Baer's termination, the Company hired a contract employee to fill the executive producer role that Baer held. Upon information and belief, this individual was hired to perform Baer's job responsibilities. Moreover, upon information and belief, this individual is a woman without children.

***Effects on Plaintiffs***

110.    Baer and Stevens each suffered from economic and emotional distress that must be remediated. What both hoped to be a joyful time to connect with family, and with respect to Stevens, heal collectively from a traumatic birth experience, was instead shrouded by feelings of fear and anxiety that their livelihood was at jeopardy in the hands of Defendants.

111.    As described, *inter alia*, Stevens began to see a therapist due to the increasing emotional harm inflicted by the Defendants, which caused her an undue amount of stress and anxiety.

112.    During the time in which she was unemployed, Baer suffered considerable emotional distress. She suffered from stress, sleeplessness, self-doubt, feelings of humiliation, and depressive thoughts. Baer was consumed with financial worry; she would lie in bed at night worrying about her and her husband's ability to afford their mortgage payments and how they would support their unborn child. Additionally, Baer was worried about her health insurance and whether she would be able to continue seeing the doctors she had been using. Baer was extremely anxious about interrupting her prenatal care during such a sensitive time in her pregnancy.

<u>**FIRST CAUSE OF ACTION:**</u>
**Discrimination in Violation of Title VII**
*Against Frank Collective*

113.    Plaintiff Stevens repeats and realleges each and every allegation set forth above with the same force and effect as if fully set forth herein.

114.     Frank Collective unlawfully discriminated against Plaintiff in the terms and conditions of her employment, including unlawful termination, on the basis of her pregnancy, in violation of Title VII.

115.     Frank Collective's unlawful discriminatory acts caused Plaintiff to suffer economic damages, including lost wages and benefits, as well as emotional distress damages.

116.     Frank Collective acted willfully, with malice and/or reckless indifference to Plaintiff's rights, entitling Plaintiffs to an award of punitive damages.

117.     Therefore, Frank Collective is liable to Plaintiff for back pay, front pay, emotional distress and other compensatory damages, punitive damages, prejudgment interest, post-judgment interest, attorneys' fees, costs and disbursements.

## SECOND CAUSE OF ACTION:
### Retaliation in Violation of Title VII
*Against Frank Collective*

118.     Plaintiff Stevens repeats and realleges each and every allegation set forth above with the same force and effect as if fully set forth herein.

119.     Frank Collective unlawfully retaliated against Plaintiff by terminating her employment on the basis of her protected activities in violation of Title VII.

120.     Frank Collective's unlawful retaliatory acts caused Plaintiff to suffer economic damages, including lost wages as well as emotional distress damages.

121.     Frank Collective acted willfully, with malice and/or reckless indifference to Plaintiff's rights, entitling Plaintiff to an award of punitive damages.

122.     Therefore, Frank Collective is liable to Plaintiff for back pay, front pay, emotional distress and other compensatory damages, punitive damages, prejudgment interest, post-judgment interest, attorneys' fees, costs and disbursements.

### THIRD CAUSE OF ACTION:
**Discrimination in Violation of the NYSHRL**
*Against all Defendants*

123.    Plaintiff Stevens repeats and realleges each and every allegation set forth above with the same force and effect as if fully set forth herein.

124.    Defendants unlawfully discriminated against Plaintiff Stevens in the terms and conditions of her employment on the basis of her pregnancy, in violation of NYSHRL.

125.    As described herein, Defendant Iuen is personally and directly liable in that she aided and abetted Frank Collective in its unlawful discriminatory acts against Plaintiff, in violation of NYSHRL § 296(6).

126.    Alternatively, in terms of the economic realities of the workplace, Defendant Iuen is personally and directly liable as employers for the unlawful discrimination against Plaintiff in violation of NYSHRL § 296(1).

127.    Defendants' unlawful discriminatory acts caused Plaintiff to suffer economic damages, including lost wages and benefits, as well as emotional distress damages.

128.    Defendants acted willfully, with malice and/or reckless indifference to Plaintiff's rights, entitling them to awards of punitive damages.

129.    Therefore, Defendants are liable to the Plaintiff for backpay, front pay, emotional distress and other compensatory damages, punitive damages, prejudgment interest, post-judgment interest, attorneys' fees, cost and disbursements.

### FOURTH CAUSE OF ACTION:
**Retaliation in Violation of NYSHRL**
*Against all Defendants*

130.    Plaintiff Stevens repeat and reallege each and every allegation set forth above with the same force and effect as if fully set forth herein.

19

131.    Defendants unlawfully retaliated against Plaintiff Stevens by, inter alia, terminating Plaintiff on the basis of her protected activities in violation of the NYSHRL.

132.    As described herein, Defendant Iuen is personally and directly liable in that she aided and abetted Frank Collective in its unlawful discriminatory acts against Plaintiffs, in violation of NYSHRL § 296 (6).

133.    Alternatively, in terms of economic realities of the workplace, Defendant Iuen is personally and directly liable as employers for the unlawful discrimination against Plaintiff in violation of NYSHRL § 296 (1).

134.    Defendants' unlawful retaliatory acts caused Plaintiff to suffer economic damages, including lost wages as well as emotional distress damages.

135.    Defendants acted willfully, with malice and/or reckless indifference to Plaintiff's rights, entitling them to an award of punitive damages.

136.    Therefore, Defendants are liable to Plaintiff for back pay, front pay, emotional distress and other compensatory damages, prejudgment interest, post-judgment interest, attorneys' fee, cost and disbursements.

**FIFTH CAUSE OF ACTION:**
**Discrimination in Violation of the NYCHRL**
*Against all Defendants*

137.    Plaintiff Stevens repeat and reallege each and every allegation set forth above with the same force and effect as if fully set forth herein.

138.    Defendants unlawfully discriminated against Plaintiff in the terms and conditions of their employment on the basis of their pregnancy in violation of NYCHRL.

139.    As described herein, Defendant Iuen is personally and directly liable in that she aided and abetted Frank Collective in its unlawful discriminatory acts against Plaintiff, in violation of NYCHRL § 8-107 (6).

140.    Alternatively, in terms of economic realities of the workplace, Defendant Iuen is personally and directly liable as employers for the unlawful discrimination against Plaintiff, in violation of NYCHRL § 8-107 (1) (a).

141.    Defendants acted willfully, with negligence or reckless indifference to Plaintiff's rights under the NYCHRL, entitling Plaintiff to an award of punitive damages.

142.    Defendants' unlawful discriminatory acts caused Plaintiff to suffer economic damages, including lost wages and benefits, as well as economic distress damages.

143.    Therefore, Defendants are liable to Plaintiff for back pay, front pay, emotional distress and other compensatory damages, punitive damages, prejudgment interest, post-judgment interest, attorneys; fees, costs and disbursements.

### SIXTH CAUSE OF ACTION:
**Retaliation in Violation of NYCHRL**
*Against all Defendants*

144.    Plaintiff Stevens repeat and reallege each and every allegation set forth above with the same force and effect as if fully set forth herein.

145.    Defendants unlawfully retaliated against Plaintiff in the terms and conditions of her employment and terminated her employment on the basis of her pregnancy status, in violation of NYCHRL.

146.    As described herein, Defendant Iuen is personally and directly liable in that she aided and abetted Frank Collective in its unlawful discriminatory acts against Plaintiff, in violation of NYCHRL § 8-107 (6).

147.    Alternatively, in terms of economic realities of the workplace, Defendant Iuen is personally and directly liable as employers for the unlawful discrimination against Plaintiff, in violation of NYCHRL § 8-107 (1) (a).

148.    Defendants acted willfully, with negligence or reckless indifference to Plaintiff's rights under the NYCHRL, entitling Plaintiff to an award of punitive damages.

149.    Defendants' unlawful discriminatory acts caused Plaintiff to suffer economic damages, including lost wages and benefits, as well as economic distress damages.

150.    Therefore, Defendants are liable to Plaintiff for back pay, front pay, emotional distress and other compensatory damages, punitive damages, prejudgment interest, post-judgment interest, attorneys; fees, costs and disbursements.

**SEVENTH CAUSE OF ACTION:**
**Discrimination in Violation of CFEHA**
*Against Frank Collective*

151.    Plaintiff Baer repeats and realleges each and every allegation set forth above with the same force and effect as if fully set forth herein.

152.    Frank Collective unlawfully discriminated against Plaintiff Baer in the terms and conditions of her employment, including unlawful termination, on the basis of her pregnancy, in violation of the CFEHA.

153.    Frank Collective's unlawful discriminatory acts caused Plaintiff Baer to suffer economic damages, including lost wages and benefits, as well as emotional distress damages.

154.    Frank Collective acted willfully, with malice and/or reckless indifference to Plaintiff Baer's rights, entitling Plaintiff to an award of punitive damages.

155.    Therefore, Frank Collective is liable to Plaintiff Baer for back pay, front pay, emotional distress and other compensatory damages, punitive damages, prejudgment interest, post-judgment interest, attorneys' fees, costs and disbursements.

**EIGHTH CAUSE OF ACTION:**
**Retaliation in Violation of CFEHA**
*Against Frank Collective*

156.    Plaintiff Baer repeats and reallege each and every allegation set forth above with the same force and effect as if fully set forth herein.

157.    Frank Collective unlawfully retaliated against Plaintiff Baer by terminating her employment on the basis of her protected activities in violation of CFEHA.

158.    Frank Collective's unlawful retaliatory acts caused Plaintiff Baer to suffer economic damages, including lost wages as well as emotional distress damages.

159.    Frank Collective acted willfully, with malice and/or reckless indifference to Plaintiff Baer's rights, entitling Plaintiff to an award of punitive damages.

160.    Therefore, Frank Collective is liable to Plaintiff Baer for back pay, front pay, emotional distress and other compensatory damages, punitive damages, prejudgment interest, post-judgment interest, attorneys' fees, costs and disbursements.

**DEMAND FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this this Court enter judgment that:

a)      Declares that the discriminatory actions, practices, and policies of Defendants as set forth above violated Title VII, including as amended by PDA, NYSHRL, NYCHRL, and CFEHA;

b)      Declares that the retaliatory actions, practices and policies of defendants set forth above violated Title VII, including as amended by PDA, NYSHRL, NYCHRL, and CFEHA;

c)      award monetary damages to Plaintiffs to compensate them for the discrimination they

experienced, including economic damages, and damages for emotional distress;

d)      award Plaintiffs punitive damages pursuant to Title VII, NYSHRL, NYCHRL and

CFEHA;

e)      award Plaintiffs reasonable attorneys' fees and costs; and

f)      grants such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to FRCP 38(b), Plaintiffs demand a trial by jury.

Dated: Brooklyn, New York
        March 1, 2022

Respectfully submitted,

Crumiller P.C.

Hilary J. Orzick
Crumiller P.C.
16 Court St, Ste 2500
Brooklyn, NY 11241
(212) 390-8480
hjo@crumiller.com
*Attorney for Plaintiffs*